IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| NICOLE ISABO MORALES, | ) | CASE NO.  1:21-CV-00588-CAB |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE CHRISTOPHER A. BOYKO |
| vs. | ) | UNITED STATES DISTRICT JUDGE |
| | ) | |
| COMMISSIONER OF SOCIAL SECURITY, | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| Defendant. | ) | |
| | ) | **REPORT & RECOMMENDATION** |
| | ) | |
| | ) | |

Plaintiff, Nicole Isabo Morales ("Plaintiff" or "Morales"), challenges the final decision of

Defendant, Kilolo Kijakazi,[1] Acting Commissioner of Social Security ("Commissioner"), denying her

application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42

U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).

This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under

Local Rule 72.2(b) for a Report and Recommendation.  For the reasons set forth below, the Magistrate

Judge recommends that the Commissioner's final decision be AFFIRMED.

## I.    PROCEDURAL HISTORY

In February 2019, Morales filed an application for SSI, alleging a disability onset date of

December 5, 2012[2] and claiming she was disabled due to major depression, PTSD, anxiety, severe

migraines, OCD, neuropathy, HIV, carpal tunnel, and thyroid. (Transcript ("Tr.") 15, 88, 110.)  The

---

[1] On July 9, 2021, Kilolo Kijakazi became the Acting Commissioner of Social Security.

[2] Under 20 C.F.R. § 416.335, SSI benefits are payable as of the month following the month of application. Therefore, the period at issue begins on February 13, 2019, the date of application, regardless of the alleged onset date.

application was denied initially and upon reconsideration, and Morales requested a hearing before an administrative law judge ("ALJ"). (*Id.* at 15.)

On May 26, 2020, an ALJ held a hearing, during which Morales, represented by counsel, and an impartial vocational expert ("VE") testified. (*Id.*) On July 1, 2020, the ALJ issued a written decision finding Morales was not disabled. (*Id.* at 15-34.) The ALJ's decision became final on January 11, 2021 when the Appeals Council declined further review. (*Id.* at 1-6.)

On March 12, 2021, Morales filed her Complaint to challenge the Commissioner's final decision. (Doc. No. 1.) The parties have completed briefing in this case. (Doc. Nos. 12-14.) Morales asserts the following assignment of error:

> (1) After Step Three and prior to Step Four, the ALJ assessed a mental RFC finding that is unsupported [by] substantial evidence due to erroneous consideration of the opinion evidence.

(Doc. No. 12.)

## II. EVIDENCE

### A. Personal and Vocational Evidence

Morales was born in July 1988 and was 31 years-old at the time of her administrative hearing (Tr. 15, 32), making her a "younger" person under Social Security regulations. *See* 20 C.F.R. § 416.963(c). She has at least a high school education and is able to communicate in English. (Tr. 32.) She has no past relevant work. (*Id.*)

### B. Medical Evidence[3]

On June 4, 2018, Morales saw Maria Torres, LISW-S, for evaluation of her mental health problems. (Tr. 308.) Morales endorsed depression, panic attacks, and a long history of mental health

---

[3] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs. As Morales challenges only the ALJ's mental findings, the Court further limits its discussion of the evidence to Morales' mental impairments.

issues.  (*Id.*)  Morales reported spending time with her sister-in-law and one good friend, and her hobbies included cooking, playing with her cat, and drawing.  (*Id.* at 310.)  Morales endorsed symptoms consisting of low motivation, crying without a reason, irritability, hopelessness, excessive thinking, excessive eating, nervous energy, being stressed out, recurrent memories about past trauma, nightmares, hypervigilance, short temper, mood changes, irritability, forgetfulness, lack of concentration, poor emotional control, impulsivity, poor choices, mood swings, sleep problems, and eating problems.  (*Id.* at 315-17.)  On examination, Torres found Morales well-groomed with normal motor activity and speech, preoccupied attitude, constricted affect, depressed mood, intact associations, no delusions or hallucinations, and fair insight and judgment.  (*Id.* at 318-19.)  While Morales had "difficulty concentrating during Intake," she was appropriate and demonstrated fair insight and judgment.  (*Id.* at 319.)  Torres diagnosed Morales with major depressive disorder, recurrent episode, and generalized anxiety disorder.  (*Id.* at 320.)

On September 17, 2018, Morales saw Matthew Andersen, M.D., for a psychiatric evaluation.  (*Id.* at 321.)  Morales reported suffering from a lot of depression because of past trauma, including being raped at 12 and contracting HIV at 17.  (*Id.*)  Morales endorsed nightmares of past traumas, feeling anxious when alone, feeling like she can hear someone saying her name, and panic attacks twice a week where she felt tremulous, sweaty, and nauseous.  (*Id.*)  Morales also complained of poor sleep and irritability and told Dr. Andersen it took a lot of effort to shower and that she was gaining weight from eating out of boredom.  (*Id.*)  Morales reported her energy level was fair.  (*Id.*)  Morales told Dr. Andersen she had been out of her medications for two months.  (*Id.*)  On examination, Dr. Andersen found Morales obese, calm, and dressed appropriately, with good eye contact, normal speech, "'anxious'" mood, euthymic affect, linear, coherent, and organized thought process, good impulse control, and good insight/judgment.  (*Id.* at 323.)  Morales denied auditory or visual hallucinations.  (*Id.*)  Dr. Andersen started Morales on Topamax, sertraline, and clonazepam and recommended supportive psychotherapy.  (*Id.*)

On October 15, 2018, Morales saw Dr. Andersen for medication management. (*Id.* at 665.) Dr. Andersen noted Morales arrived on time and that she was calm, dressed appropriately, and had an "okay" mood. (*Id.*) Morales reported continued sleep struggles, although she was waking up less than before and felt less anxious during the day. (*Id.*) Morales told Dr. Andersen she was taking her medication as prescribed and denied significant medication side effects. (*Id.*) On examination, Dr. Andersen found Morales well-groomed with normal speech, normal behavior, anxious affect, linear thought process, intact associations, no delusions or hallucinations, and good insight and judgment. (*Id.* at 666.) Dr. Andersen noted Morales had improved since her last visit and he adjusted her medications. (*Id.*)

On November 19, 2018, Morales saw Dr. Andersen for medication management. (*Id.* at 668.) Dr. Andersen noted Morales arrived on time and that she was calm and dressed appropriately. (*Id.*) Morales reported being "'moody' and crying for 2 weeks" and told Dr. Andersen her mood was worse than before, although klonopin helped. (*Id.*) Morales reported feeling stress about her mother, who had been calling her a lot about problems going on in Puerto Rico, and that her husband had relapsed. (*Id.* at 668-69.) Morales told Dr. Andersen she was taking her medication as prescribed and denied significant medication side effects. (*Id.* at 668.) On examination, Dr. Andersen found Morales well-groomed with normal speech, normal behavior, anxious affect, linear thought process, intact associations, no delusions or hallucinations, and good insight and judgment. (*Id.* at 669.) Dr. Andersen noted Morales had decompensated since her last visit and continued her medications. (*Id.* at 669-70.)

On December 17, 2018, Morales saw Dr. Andersen for medication management. (*Id.* at 671.) Dr. Andersen noted Morales arrived on time, that she was calm and dressed appropriately, and had a "'stressed'" mood. (*Id.*) Morales reported being upset a few days ago where she felt anxious and felt like she was hearing things. (*Id.*) The auditory hallucinations went away after the panic subsided. (*Id.*) Morales told Dr. Andersen she had been more irritable lately and had been remembering her past traumas

4

more lately, although she felt better that day.  (*Id.*)  Morales reported good sleep but felt like she was eating too much.  (*Id.* at 672.)  On examination, Dr. Andersen found Morales well-groomed with normal speech, normal behavior, anxious affect, linear thought process, intact associations, no delusions or hallucinations, and good insight and judgment.  (*Id.*)  Dr. Andersen noted Morales had shown no change since her last visit and adjusted her medications.  (*Id.*)

On February 25, 2019, Morales saw Dr. Andersen for medication management.  (*Id.* at 677.)  Dr. Andersen noted Morales arrived on time, that she was calm and dressed appropriately, and had an "'up and down'" mood.  (*Id.*)  Morales reported still finding her relationships affect her mood and stress, and she had continued sleep problems and occasional panic attacks.  (*Id.*)  On examination, Dr. Andersen found Morales well-groomed with normal speech, normal behavior, depressed affect, linear thought process, intact associations, no delusions or hallucinations, and good insight and judgment.  (*Id.* at 678.) Dr. Andersen noted Morales had shown no change since her last visit and adjusted her medication.  (*Id.*)

On March 25, 2019, Morales saw Dr. Andersen for medication management.  (*Id.* at 680.)  Dr. Andersen noted Morales arrived five minutes late, that she was calm and dressed appropriately, and had an "'up and down'" mood.  (*Id.*)  Morales reported she was going to Puerto Rico next week and that she was no longer babysitting because her friend no longer needed the help.  (*Id.* at 681.)  On examination, Dr. Andersen found Morales well-groomed with normal speech, normal behavior, euthymic affect, linear thought process, intact associations, no delusions or hallucinations, and good insight and judgment.  (*Id.*) Dr. Andersen noted Morales had shown no change since her last visit and continued her medications.  (*Id.* at 681-82.)

On May 13, 2019, Morales saw Dr. Andersen for medication management.  (*Id.* at 683.)  Dr. Andersen noted Morales arrived early, that she was calm and dressed appropriately, and had a "'depressed'" mood.  (*Id.*)  Morales reported her anxiety had been up and down and she had gone to

Puerto Rico where she saw her estranged husband, mother, and grandmother.  (*Id.*)  Morales told Dr. Andersen she had run out of one of her medications while in Puerto Rico.  (*Id.* at 684.)  Dr. Andersen explained that returning to a place that is associated with trauma while running out of medication and being out of therapy could cause her to experience triggers that could cause a depressed mood.  (*Id.*)  On examination, Dr. Andersen found Morales well-groomed with normal speech, normal behavior, bad mood, euthymic affect, linear thought process, intact associations, no delusions or hallucinations, and good insight and judgment.  (*Id.*)  Dr. Andersen noted Morales had decompensated since her last visit and continued her medications.  (*Id.* at 684-85.)

On May 20, 2019, Morales saw Dr. Andersen for medication management.  (*Id.* at 686.)  Dr. Andersen noted Morales had received a letter from SNAP that her benefits were going to be stopped and Morales needed a letter from him stating that she was disabled.  (*Id.*)  Morales reported when she tried working before, she had a depressed mood and missed work.  (*Id.*)  When she was at work, she was easily irritated and was triggered by stressful situations that would normally be tolerable.  (*Id.*)  On examination, Dr. Andersen found Morales well-groomed with normal speech, normal behavior, cranky mood, euthymic affect, linear thought process, intact associations, no delusions or hallucinations, and good insight and judgment.  (*Id.* at 687.)  Dr. Andersen noted there had been no change since Morales' last visit and continued her medications.  (*Id.* at 687-88.)

That same day, Dr. Andersen wrote a letter stating that Morales met the definition of disabled under the Americans with Disabilities Act.  (*Id.* at 601.)  Dr. Andersen opined:

> As a result of mental illness, Nicole Morales has certain limitations related to anxiety, depression, and social interactions.  She is unable to function adequately in a work setting, interact with co-workers or customers/client in a productive manner due to difficulties managing stressful situations.  These limitations have rendered her disabled and unable to work.  In order to assist in alleviating these difficulties, and to improve their ability to lead a better life I am recommending continuation of benefits.

(*Id.*)

On June 4, 2019, Morales saw Michael Faust, Ph.D., for a consultative psychological evaluation. (*Id.* at 298-305.) Morales told Dr. Faust the basis for her disability was that she did not like to be around people, she was depressed, she was irritated, and she experienced panic attacks. (*Id.* at 298.) Morales reported a significant history of abuse, including being raped at age 16 and contracting HIV as a result. (*Id.* at 299.) Morales lived alone in an apartment with her two cats, and her mother sent her money to pay her rent. (*Id.*) Morales reported "'lots'" of suicidal thoughts, the last time being a month ago, and that she had cut her wrists two months ago. (*Id.* at 300.) Morales described her current mood as depressed and told Dr. Faust she was sad and cried a lot. (*Id.*) Morales endorsed anhedonia, lack of social interest due to at least in part anger issues and her tendency to argue with others, feeling tired and fatigued, and lack of sleep due to worry and nightmares. (*Id.*) Morales described her day as moving from the bed to the couch and only leaving home for appointments. (*Id.*) Morales denied shopping independently and reported daily panic attacks. (*Id.* at 301.) Her medication helped a little bit. (*Id.*) She showered every day, although sometimes she did not shower for three days, and she reported auditory hallucinations consisting of voices telling her to kill herself. (*Id.*)

During the examination, Morales completed the history form independently. (*Id.*) Dr. Faust noted Morales presented as "rather quiet, passive, and withdrawn with a depressed mood" and that Morales "kept scratching her body anxiously." (*Id.*) Morales continued to scratch incessantly and said she felt something crawling on her in the waiting room, but there was no sign of bugs in the waiting room or the exam room. (*Id.*) Dr. Faust noted he had to simplify questions at times, and when he did Morales could understand his questions. (*Id.*) Morales tended to talk in a monotone voice and showed very little emotion in her speech, although her thinking appeared logical and linear. (*Id.*) Morales demonstrated a blunted affect and appeared depressed and anxious throughout the session. (*Id.* at 302.) Morales shifted in her seat, shook her right leg, and wrung her hands during the interview. (*Id.*) Dr. Faust noted Morales

7

had a limited frustration tolerance and gave up easily on tasks. (*Id.*) Morales told Dr. Faust she did not know the President of the United States and answered "I don't know" to subtraction and division questions. (*Id.*) Morales gave up on digits forward and backward, stated she could not recall three items after a five-minute delay, and gave up on serial 7s and 3s. (*Id.*) Morales responded to Dr. Faust's questions with simple responses, appeared stressed and agitated, and demonstrated "simplistic social judgment." (*Id.* at 303.) Dr. Faust diagnosed Morales with major depressive disorder, single episode, severe with psychotic features, and PTSD. (*Id.*) Dr. Faust opined:

- Morales "can be expected to struggle with remembering and/or carrying out instructions for task completion due to her continued attention deficits which are secondary symptoms of PTSD and depression."

- Morales "is viewed to have limitations with regard to attention, concentration, persistence and/or work pace related to her psychological issues of depression and PTSD."

- Morales "is currently viewed to have some limitations regarding responding appropriately to supervision or to coworkers in an employment setting due to severe symptoms of depression and PTSD."

- Morales "is viewed to some [sic] have limitations in her ability to respond appropriately to work pressures in an employment setting due to symptoms associated with a major depressive disorder and a [sic] PTSD."

(*Id.* at 304-05.)

On June 10, 2019, Morales saw Dr. Andersen for medication management. (*Id.* at 689.) Dr. Andersen noted Morales arrived on time, that she was calm and dressed appropriately, and had a "'not doing well'" mood. (*Id.*) Morales reported being stressed and irritable, having poor sleep and nightmares, feeling very depressed, and isolating, even though she was taking her medication as prescribed. (*Id.*) Morales denied suicidal ideation. (*Id.*) On examination, Dr. Andersen found Morales well-groomed with normal speech, normal behavior, anxious mood, irritable/angry affect, linear thought process, intact associations, no delusions or hallucinations, and good insight and judgment. (*Id.* at 690.) Dr. Andersen noted Morales had shown no change since her last visit and added Abilify. (*Id.*)

On August 5, 2019, Morales saw Dr. Andersen for medication management.  (*Id.* at 692.)  Dr. Andersen noted Morales arrived on time, that she was calm and dressed appropriately, and had a "'horrible'" mood.  (*Id.*)  Morales reported being stressed and anxious as a result of her landlord threatening to sue her, and that she had been spending a lot of time at a friend's house because she felt uncomfortable in her apartment.  (*Id.* at 692-93.)  Morales told Dr. Andersen she was having trouble sleeping but she had run out of all her medications.  (*Id.* at 693.)  Morales denied suicidal ideation.  (*Id.* at 692.)  On examination, Dr. Andersen found Morales well-groomed with normal speech, normal behavior, anxious affect, linear thought process, intact associations, no delusions or hallucinations, and good insight and judgment.  (*Id.* at 693.)  Dr. Andersen noted Morales was decompensating since her last visit and resumed her medications.  (*Id.* at 693-94.)

On September 3, 2019, Morales saw Rachelle Spitz, LISW, at Signature Health for a mental health assessment.  (*Id.* at 888.)  Morales reported not being happy with her mental health treatment at Catholic Charities and wanted to switch providers.  (*Id.* at 889.)  Morales reported she lived alone in an apartment in Cleveland.  (*Id.*)  Her mother paid her rent and Morales received food stamps.  (*Id.*)  Morales reported she had received several mental health diagnoses and had tried several different medications.  (*Id.*)  Morales endorsed current symptoms consisting of inability to sleep, appetite changes, seeing shadows, hearing things, fluctuating mood, crying, isolating, and having suicidal thoughts.  (*Id.*)

On September 9, 2019, Morales saw Dr. Andersen for medication management.  (*Id.* at 695.)  Dr. Andersen noted Morales arrived on time, that she was calm and dressed appropriately, and had an "irritable" mood.  (*Id.*)  Morales reported sleeping better, although she had trouble with it since her last visit.  (*Id.*)  Morales told Dr. Andersen she had seen shadows in her apartment when she was depressed and tearful.  (*Id.* at 696.)  Morales reported continuing nightmares and feeling alone and anxious when she woke up.  (*Id.*)  On examination, Dr. Andersen found Morales well-groomed with normal speech, normal

behavior, bad mood, euthymic affect, linear thought process, intact associations, no delusions or hallucinations, and good insight and judgment. (*Id.*) Dr. Andersen noted no change since Morales' last visit and continued her medications. (*Id.* at 696-97.)

That same day, Dr. Andersen completed an assessment of Morales' mental impairments. (*Id.* at 658-59.) Dr. Andersen opined that Morales' "symptoms have not responded significantly to treatment such that she could manage employment at this time." (*Id.* at 658.) Dr. Andersen stated Morales' medications helped, although insufficiently thus far. (*Id.* at 659.) Dr. Andersen opined, "Psychologically, she struggles with concentration, relating with others, frustration tolerance. She is able to follow most instructions, care for herself and manage her finances." (*Id.*)

On September 27, 2019, Morales saw Leighanna Stephenson, APN, for a psychiatric evaluation. (*Id.* at 922.) Morales reported feeling more depressed lately. (*Id.*) While she did not want to get out of bed sometimes, her cats helped get her up. (*Id.*) Morales reported other depressive symptoms, such as decreased motivation and energy, as well as manic symptoms and trauma symptoms. (*Id.*) Morales also told Stephenson about hearing voices since she was little and having visual hallucinations of seeing shadows. (*Id.*) Morales further reported anxiety and panic attacks, although she denied poor concentration. (*Id.* at 923.) Stephenson adjusted Morales' medications. (*Id.* at 924.)

On October 15, 2019, Morales saw Stephenson for follow up. (*Id.* at 890.) On examination, Stephenson found fair, not distractible attention and concentration, blunted and anxious mood and affect, normal speech, appropriate language, linear and goal-oriented thought process, intact associations, visual hallucinations, intermittent auditory hallucinations, no paranoia, intact memory, and fair judgment and insight. (*Id.* at 893-94.) Stephenson adjusted Morales' medications. (*Id.* at 897.)

On November 26, 2019, Morales saw Stephenson for medication management. (*Id.* at 904.) Morales reported she had recently returned from Puerto Rico and she was worried about her mother and

10

grandmother.  (*Id.* at 904-05.)  Morales told Stephenson Abilify had helped a bit with her depression, irritability, and racing thoughts.  (*Id.* at 905.)  Morales reported she continued to have panic attacks, anxiety, nightmares, and hypervigilance.  (*Id.*)  Stephenson adjusted Morales' medications.  (*Id.* at 905-06.)

On January 14, 2020, Morales saw Stephenson for medication management.  (*Id.* at 913.)  Morales reported continued depression, irritability, auditory and visual hallucinations, anxiety, and panic attacks. (*Id.* at 914.)  Morales continued to deny poor concentration.  (*Id.*)  Stephenson adjusted Morales' medications.  (*Id.*)

**C.     State Agency Reports**

On June 27, 2019, Michael E. Cremerius, Ph.D., found Morales had moderate limitations in all four areas of mental functioning.  (*Id.* at 97-98.)  Dr. Cremerius opined Morales was limited to understanding and remembering simple instructions, performing simple, routine tasks, having brief and superficial contact with co-workers and supervisors but no contact with the public, and adapting to routine changes.  (*Id.* at 102-04.)  Morales could not perform fast-paced tasks with strict production quotas, although she could perform variable-paced tasks with end of day production quotas.  (*Id.* at 104.)

On September 16, 2019, on reconsideration, Sandra Banks, Ph.D., affirmed Dr. Cremerius' findings, although she found Morales could have "minimal to no contact with the public."  (*Id.* at 116-17, 122-23.)

**D.     Hearing Testimony**

During the May 26, 2020 hearing, Morales testified to the following:

- She lives by herself in an apartment.  (Tr. 48.)  Sometimes she does not sleep.  (*Id.*)
  She does not ask for help with chores.  (*Id.*)  She does not bathe or dress herself often
  because of her depression.  (*Id.*)  She bathes two to three times a week.  (*Id.*)  Her
  neighbor does her laundry.  (*Id.* at 49.)  She can make a sandwich or her neighbor
  gives her food.  (*Id.*)  Her case worker or neighbor takes her places, or else she buys
  things online.  (*Id.*)  She talks to her mom, but she does not like to be around people.

(*Id.*) Sometimes she watches television or listens to music. (*Id.* at 50.) She has no other hobbies. (*Id.*) She cannot sleep at night because she is afraid, so she spends her days sleeping and playing with her cats. (*Id.*) She feeds her cats. (*Id.*)

- Her mental health has gotten worse since 2014. (*Id.* at 51.) She is depressed, she does not like to be outside, and she is paranoid that someone is going to do something to her. (*Id.*) She sleeps with the lights on. (*Id.*) She hears voices telling her things. (*Id.*) She isolates herself because she is afraid of people. (*Id.* at 56.) She cries almost every day. (*Id.*)

The ALJ found Morales had no past relevant work. (*Id.* at 59.) The ALJ then posed the following hypothetical question:

> First off, I would like you to consider a person with the same age, education, and past work as the Claimant who can occasionally lift and carry 20 pounds and frequently lift and carry 10 pounds; is able to stand and walk six hours of an eight-hour work day, and is able to sit for six hours of an eight-hour work day. This individual could perform frequent pushing and pulling with the bilateral upper extremities. They could occasionally climb ramps and stairs, but never climb ladders, ropes, or scaffolds and never crawl. This individual could perform frequent handling and fingering with the bilateral upper extremities. In addition, they can perform simple, routine tasks consistent with unskilled work with brief and superficial contact with co-workers and supervisors. And by superficial and brief I mean of a short duration for a specific purpose. This individual can perform no direct work with the general public and perform work with infrequent change. And finally, work with no fast-pace task or strict production quotas. Given such a hypothetical individual and since there is no past work for this individual, would there be any jobs for such a hypothetical individual?

(*Id.* at 59-60.)

The VE testified the hypothetical individual would be able to perform representative jobs in the economy, such as merchandise marker, cleaner, and sorter. (*Id.* at 60-61.)

### III. STANDARD FOR DISABILITY

A disabled claimant may also be entitled to receive SSI benefits. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981). To receive SSI benefits, a claimant must meet certain income and resource limitations. 20 C.F.R. §§ 416.1100, 416.1201.

12

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. § 416.920(a)(4). *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. § 416.920(b). Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. § 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience. *See* 20 C.F.R. § 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. § 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. § 416.920(g).

## IV.   SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.   The claimant has not engaged in substantial gainful activity since February 13, 2019, the application date (20 CFR 416.971 *et seq.*).

2.   The claimant has the following severe impairments: carpal tunnel syndrome, obesity, peripheral nerve disease, major depressive disorder single episode with psychotic features, posttraumatic stress disorder (PTSD), and generalized anxiety with panic disorder (20 CFR 416.920(c)).

3.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b), except she is able to occasionally lift and carry 20 pounds and frequently lift and carry 10 pounds, is able to stand and walk 6 hours of an 8-hour workday, is able to sit for 6 hours of an 8-hour workday, frequent pushing and pulling with the bilateral upper extremities; can perform simple routine tasks (consistent with unskilled work); with brief and superficial contact with co-workers and supervisors, meaning of a short duration for a specific purpose; no direct work with the general public; infrequent change; can perform work with no fast paced tasks or strict production quotas; can perform low stress work, meaning no arbitration, negotiation, responsibility for the safety of others, and/or supervisory responsibility.

5.   The claimant has no past relevant work (20 CFR 416.965).

6.  The claimant was born on July **, 1988 and was 30 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7.  The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

8.  Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10.  The claimant has not been under a disability, as defined in the Social Security Act, since February 13, 2019, the date the application was filed (20 CFR 416.920(g)).

(Tr. 17-33.)

## V.  STANDARD OF REVIEW

The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a

preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached."). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

15

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-1300, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

In her sole assignment of error, Morales asserts that the ALJ "failed to properly evaluate the opinion evidence provided by Drs. Faust and Anderson pursuant to the regulations, causing his determination to lack substantial evidence." (Doc. No. 12 at 11.) With respect to Dr. Faust's opinion, Morales argues that any vagueness in the opinion could have been resolved by re-contacting Dr. Faust, and the ALJ erred in failing to do so. (*Id.* at 13, 15, 17.) With respect to both doctors' opinions, Morales argues the ALJ cherry-picked the evidence and "painted a 'misleading picture of [Plaintiff's] mental health.'" (*Id.*) (citation omitted). Morales maintains the doctors' opinions were consistent with other evidence in the record. (*Id.* at 15, 17.) Morales asserts that with respect to Dr. Andersen's opinion, the ALJ showed "a lack of appreciation for Plaintiff's subjective4 [sic] symptoms." (*Id.* at 17.)

The Commissioner responds that the ALJ "properly evaluated the opinion evidence" and substantial evidence supports the ALJ's decision. (Doc. No. 13 at 7.) With respect to Dr. Faust's opinion, the Commissioner argues Morales fails to "show, or even allege, that Dr. Faust's assessments are more restrictive than the RFC, nor has she shown how Dr. Faust's vague assessments undermined the ALJ's

16

RFC findings." (*Id.* at 9.) The Commissioner maintains the ALJ's RFC accommodated Dr. Faust's findings. (*Id.*) With respect to Dr. Andersen's opinion, the Commissioner argues that setting aside Dr. Andersen's opinions that Morales was "disabled, unable to work, and 'unable to manage employment'" – opinions on issues reserved to the Commissioner and that are "inherently neither valuable nor persuasive" under the regulations – Morales fails to show that Dr. Andersen's assessments are more restrictive than the RFC. (*Id.* at 11.)

In her reply, Morales asserts that the Commissioner's brief is just as defective as the ALJ's decision, as "both ignore probative evidence tending to support Plaintiff's disability claim." (Doc. No. 14 at 2.)

Since Morales' claim was filed after March 27, 2017, the Social Security Administration's new regulations ("Revised Regulations") for evaluation of medical opinion evidence apply to this claim. *See Revisions to Rules Regarding the Evaluation of Medical Evidence (Revisions to Rules)*, 2017 WL 168819, 82 Fed. Reg. 5844 (Jan. 18, 2017); 20 C.F.R. § 416.920c.

Under the Revised Regulations, the Commissioner will not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings, including those from your medical sources." 20 C.F.R. § 416.920c(a). Rather, the Commissioner shall "evaluate the persuasiveness" of all medical opinions and prior administrative medical findings using the factors set forth in the regulations: (1) supportability;[4] (2) consistency;[5] (3) relationship with the claimant, including length of the treatment relationship, frequency of examinations, purpose of the treatment

---

[4] The Revised Regulations explain the "supportability" factor as follows: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. § 416.920c(c)(1).
[5] The Revised Regulations explain the "consistency" factor as follows: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 416.920c(c)(2).

relationship, extent of the treatment relationship, and examining relationship; (4) specialization; and (5) other factors, including but not limited to evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of the agency's disability program's policies and evidentiary requirements.  20 C.F.R. § 416.920c(a), (c)(1)-(5).  However, supportability and consistency are the most important factors.  20 C.F.R. § 416.920c(b)(2).

The Revised Regulations also changed the articulation required by ALJs in their consideration of medical opinions.  The new articulation requirements are as follows:

> (1)  Source-level articulation.  Because many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for us to articulate in each determination or decision how we considered all of the factors for all of the medical opinions and prior administrative medical findings in your case record.  Instead, when a medical source provides multiple medical opinion(s) or prior administrative medical finding(s), we will articulate how we considered the medical opinions or prior administrative medical findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate.  We are not required to articulate how we considered each medical opinion or prior administrative medical finding from one medical source individually.

> (2)  Most important factors.  The factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be.  Therefore, we will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision.  We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record.

> (3)  Equally persuasive medical opinions or prior administrative medical findings about the same issue.  When we find that two or more medical opinions or prior administrative medical findings about the same issue are both equally well-supported (paragraph (c)(1) of this section) and consistent with the record (paragraph (c)(2) of this section) but are not exactly the same, we will articulate how we considered the other most persuasive factors in paragraphs (c)(3) through (c)(5) of this section for those medical opinions or prior administrative medical findings in your determination or decision.

18

20 C.F.R. § 416.920c(b)(1)-(3).

"Although the regulations eliminate the 'physician hierarchy,' deference to specific medical opinions, and assigning 'weight' to a medical opinion, the ALJ must still 'articulate how [he/she] considered the medical opinions' and 'how persuasive [he/she] find[s] all of the medical opinions.'" *Ryan L.F. v. Comm'r of Soc. Sec.,* No. 6:18-cv-01958-BR, 2019 WL 6468560, at *4 (D. Ore. Dec. 2, 2019) (quoting 20 C.F.R. §§ 404.1520c(a), (b)(1)).  A reviewing court "evaluates whether the ALJ properly considered the factors as set forth in the regulations to determine the persuasiveness of a medical opinion." *Id.*

The ALJ analyzed Drs. Faust and Andersen's opinions as follows:

> Consultative examiner Michael Faust, Ph.D., opined on June 4, 2019 that the claimant can be expected to struggle with remembering and/or carrying out instructions for task completion due to her continued attention deficits secondary to symptoms of PTSD and depression; is viewed to have limitations with regard to attention, concentration, persistence, and/or work pace related to her psychological issues of depression and PTSD; is viewed to have some limitations regarding responding appropriately to supervision or to coworkers in an employment setting due to severe symptoms of depression and PTSD; and is viewed to have some limitations in her ability to respond appropriately to work pressures in a work employment setting due to symptoms associated with major depressive disorder and PTSD (Exhibit B1F). Dr. Faust concluded the claimant does not appear to have the mental ability to manage funds (*Id.*). This opinion is partially persuasive. Although somewhat vague, without specifically defined functional limitations, the opinion is largely supported by consultative examination findings of a quiet, passive, withdrawn demeanor, depressed mood, blunted affect, agitation, overt anxiety, fatigued energy, monotone speech, some difficulty understanding questions, limited frustration tolerance, and simplistic social judgment (*Id.*). However, the opinion is not entirely consistent with the remaining evidence of record. Despite the claimant's presentation at consultative examination, the remaining evidence of record contains far less remarkable mental status examination findings, including guarded, overwhelmed behavior, frequently abnormal mood and affect, and only fair insight and judgment at times, but normal motor activity, generally intact attention/concentration, without overt distractibility, consistently normal thoughts and associations, generally normal speech, consistently intact memory, and average fund of knowledge (Exhibit B2F, B3F, B9F, B13F). As a result, the undersigned finds the opinion of Dr. Faust only partially persuasive.

The claimant's psychiatrist, Matthew Anderson, M.D., of Catholic Charities, noted by way of a To Whom It May Concern letter dated May 20, 2019 that the claimant meets the definition of disabled under the Americans with Disabilities Act (Exhibit B6F/4). Dr. Anderson noted that as a result of mental illness, the claimant has certain limitations related to anxiety, depression, and social interactions (*Id.*). He noted the claimant is unable to function adequately in a work setting, or interact with coworkers or customers/clients in a productive manner due to difficulties managing stressful situations (*Id.*). Dr. Anderson opined that these limitations have rendered the claimant disabled and unable to work (*Id.*). He noted that in order to assist in alleviating these difficulties, and to improve the claimant's ability to lead a better life, he recommends continuation of benefits (*Id.*).

On September 9, 2019, Dr. Anderson rendered an opinion wherein he noted diagnoses of major depressive disorder, generalized anxiety disorder with panic, and PTSD (Exhibit B9F/2-5). Dr. Anderson noted the claimant's trauma and mood symptoms began at 12 years of age following rape (*Id.*). He noted that since her admission to the clinic, the claimant has continued to report significant and debilitating symptoms of PTSD and depression/anxiety likely triggered by past trauma (*Id.*). Dr. Anderson opined the claimant's symptoms have not responded significantly to treatment such that she could manage employment at this time (*Id.*). He noted that medications help, but insufficiently at this time (*Id.*). Dr. Anderson opined that psychologically, the claimant struggles with concentration, relating with others, and frustration tolerance; however, he noted the claimant is able to follow most instructions, care for herself, and manage her finances (*Id.*).

The undersigned does not provide articulation about the evidence that is inherently neither valuable nor persuasive in accordance with 20 CFR 416.920b(c). This includes the conclusions by Dr. Anderson that the clamant is disabled, unable to work, and unable to manage employment at present (Exhibit B6F/4; B9F/2-5). The remainder of the opinions are only partially persuasive. Dr. Anderson's conclusions that the claimant experiences some limitations related to anxiety, depression, and social interactions, including difficulty with concentration, relating with others, and tolerating frustration, are largely supported by the diagnoses and symptoms, likely triggered by past trauma, cited therein (*See Id.*). In addition, these portions of the opinions are generally consistent with the remaining evidence of record, including findings of guarded, overwhelmed behavior, an anxious, reserved, and/or blunted mood/affect, and occasionally verbose or hesitant speech, but good hygiene/grooming, normal alertness and orientation, cooperative behavior, pleasant demeanor, fair eye contact, otherwise normal speech/language, normal thoughts and associations, average fund of knowledge, fair attention/concentration, intact memory, and fair insight/judgment on subsequent examinations (*Id.*). However, some of the limitations contained in Dr. Anderson's opinions, such as his finding that the claimant is totally unable to function adequately in work setting, are inadequately supported by Dr. Anderson's own treatment notes, which contain

evidence of calm demeanor, intact hygiene/grooming, normal motor activity, behavior, thoughts, speech, and associations, and good impulse control (Exhibit B2F, B3F, B9F). They are also inconsistent with the remaining evidence of record, including recent examination findings of good hygiene/grooming, pleasant, cooperative behavior, normal thoughts and associations, fair attention/concentration, with no overt distractibility, intact memory, and fair insight/judgment (Exhibit B13F). As a result, Dr. Anderson's opinions are only partially persuasive.

(Tr. 30-31.)

Regarding Dr. Faust's opinion, an ALJ may assign less weight to an opinion for vagueness. *Ackles v. Comm'r of Soc. Sec.*, 470 F. Supp. 3d 744, 747 (N.D. Ohio 2020) ("The vagueness of a medical opinion is a proper basis on which to afford it less weight.") (citations omitted). *See also Jones v. Comm'r of Soc. Sec.*, Case No. 1:19-cv-1076, 2020 WL 870939, at *12 (N.D. Ohio Feb. 21, 2020) ("The ALJ also adequately explained that [the doctor's] opinion was vague and failed to adequately describe Jones's functional limitations.") (citations omitted). Nor was the ALJ required to contact Dr. Faust for clarification, as the ALJ determined she had enough evidence before her to decide whether Morales was disabled and therefore did not need to consider obtaining additional information. *See* 20 C.F.R. § 416.920b(b)(1)-(2). Furthermore, the ALJ found Dr. Faust's opinion inconsistent with, and unsupported by, medical evidence in the record, citing specific evidence in support. (Tr. 30.) Finally, the Commissioner's argument that Morales fails to show that Dr. Faust's assessments were more restrictive than the RFC, which provided limitations regarding attention, concentration, persistence, and pace, interaction with others, and the ability to respond to work pressures, is well-taken.

Regarding Dr. Andersen's opinions, the ALJ properly declined to analyze the portions of his opinions that involved matters reserved to the Commissioner, including his statements that Morales was disabled, unable to work, and unable to manage employment. 20 C.F.R. § 416.920b(c). While Morales' reply brief focuses on Dr. Andersen's statement that she could not function adequately in a work setting, this seems to go to the ultimate issue of disability reserved to the Commissioner. However, even if it did

not, the ALJ found Dr. Andersen's remaining opinions inconsistent with, and unsupported by, medical evidence in the record, including Dr. Andersen's own treatment notes, citing specific evidence in support. (Tr. 30-31.)  While Morales also raises Dr. Andersen's opinion regarding her inability to interact with coworkers or customers in stressful situations in her reply brief, she again fails to show how those opinions were more restrictive than the RFC, which limited her to low stress work with brief and superficial contact with supervisors and coworkers and no direct work with the general public.

The ALJ addressed the conflicting evidence in her opinion, including findings supportive of disability, and did not ignore contrary lines of evidence.  It is the ALJ's job to weigh the evidence and resolve conflicts, and she did so here.  While Morales would weigh the evidence differently, it is not for the Court to do so on appeal.  The Court acknowledges there is evidence in the record that supports Morales' argument, but the ALJ's findings herein are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion.  *See Buxton*, 246 F.3d at 772-3; *Her*, 203 F.3d at 389-90.

Accordingly, and for all the reasons set forth above, Morales' assignment of error is without merit and does not provide a basis for remand.

## VII.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

Date: March 30, 2022

*s/ Jonathan Greenberg*
Jonathan D. Greenberg
United States Magistrate Judge

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *Berkshire v. Beauvais*, 928 F.3d 520, 530-31 (6th Cir. 2019).**